IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:11-CR-131 |
| v. | : | JUDGE ALGENON L. MARBLEY |
| DAVID P. CRAIL, | : | |
| Defendant. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant David P. Crail's Motion to Suppress. (Doc. 9.) This Court had a suppression hearing on July 23, 2012. For the reasons set forth herein, Crail's Motion to Suppress is **DENIED**.

### II. BACKGROUND

FBI in Kalamazoo, Michigan forwarded an investigative lead to FBI in Columbus, Ohio that Crail was a wanted fugitive, and there was a warrant out for his arrest. The Kalamazoo FBI also relayed information to the Columbus FBI that Crail was living at 3256 Rothschild Court, Dublin, Ohio, under the alias Raymond Lyons. Crail was a member of a drug trafficking organization, had been charged previously as a felon in possession of firearms, and had a conviction for felonious assault with a deadly weapon. Crail was married to Jessica Shipe, who was using the alias Maranda Lyons, and had a drug conspiracy conviction. The Columbus FBI was also informed that there was a possibility that additional persons could be living at the Dublin residence because someone other than Crail was receiving mail there.

On April 27, 2010, an arrest warrant was executed for Crail's arrest, and a task force went to the Dublin residence. Prior to their arrival, the task force was advised of the potential for violence, firearms, multiple persons, and fictitious identities. Upon arrival, the officers noticed a vehicle in the driveway backed-up against the garage without plates, making it impossible for them to ascertain to whom it belonged. After waiting in a parking lot across from the Dublin residence for several hours with no action, ten officers approached the residence. Six officers approached the front porch while the other four covered the perimeter to ensure no one could escape through the back door.

At approximately 9:45 a.m., the officers knocked on the front door of the residence. According to the government, Crail answered the door after several knocks. Crail claims he was sleeping when he heard the knocks on the door. Crail identified himself initially as Raymond Lyons. At the suppression hearing, Officer Patrick O'Rourke testified that when Crail came to the door, an officer was holding the storm door open, and the main door to the home remained ajar. Crail eventually admitted his correct identity, and O'Rourke testified that the officer brought him out onto the porch and handcuffed him. O'Rourke stayed with Crail while an entry team of officers went into the home. O'Rourke testified that he and the other officers who stayed with Crail could not get Crail into the police cruiser because of his size and called for a police van to come and transport Crail. The van took some time to arrive. As a result, the officers and Crail were standing in the front yard for some time.

At the suppression hearing, Officer James K. Simmons also testified that he main door remained ajar while Crail was talking with the officers. Simmons testified that the officers could hear and see movement through the five to six inch gap. Simmons testified that he could not identify who was inside the home from the porch, but he did hear and see movement.

While Crail was being handcuffed, Simons testified that he entered the home to conduct a protective sweep to secure the safety of the nearby officers and Crail. Once inside, he encountered Shipe immediately, who identified herself under her alias. Eventually another person, Preston Karaba, emerged from a room as well. Both Crail and Karaba were detained and handcuffed. Simons testified that he could not get a clear answer from Shipe and Karaba as to whether there were other individuals present in the home.

The officers conducted a protective sweep of the residence. On the first floor of the house the officers observed in plain view: drug paraphernalia; drug residue; and firearm-related items (ammunition, magazines, and a gun safe). The officers did not encounter any other persons. The officers went into the basement. The parties disagree about whether the basement door was locked or unlocked. Again, no one was in the basement, but the officers discovered more contraband and firearm-related items. The officers smelled marijuana and observed in plain view two rows of marijuana plants. They entered a second room in the basement with an unlocked door, and discovered additional marijuana plants.

After conducting the sweep, the task force obtained a search warrant, and searched the remainder of the residence. The Columbus FBI seized 130 marijuana plants, eight firearms from a gun safe that Crail opened for them, and one firearm hidden in the master bedroom.

### III. LAW AND ANALYSIS

Crail argues the officer's warrantless search of his home violated his Fourth Amendment rights. He contends that the officers had no reason to believe there were any dangerous persons inside the home, and therefore, no justification for the purported protective sweep. The government counters that the protective sweep of the entire residence was proper and complied with the Fourth Amendment. Alternatively, argues the Government, even if the Court finds that

the protective sweep of the basement was unconstitutional, the search warrant should not be suppressed because it was based on valid evidence found during the first-floor sweep.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. The general rule is that warrantless searches are unreasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court has recognized, however, that the Fourth Amendment permits protective sweeps in conjunction with in-home arrests. *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

A protective sweep is "a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327. There are two types of protective sweeps. *Id.* at 334–35. The first type of protective sweeps allows officers, as "a precautionary matter and without probable cause or reasonable suspicion, to look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. The second category of protective sweeps permits officers to search beyond immediately adjoining places, but "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The Supreme Court emphasized that the second type of protective sweeps "if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. It should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* The government submits that the protective sweep in question fell within the second category of protective sweeps.

The Supreme Court has acknowledged that "[t]he risk of danger in the context of an

arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." *Id.* at 333. This is because "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf,'" and "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* A protective sweep is still warranted where a defendant is arrested directly outside of, but close to, his or her home, if the officers have a specific, reasonable basis for believing there is a pending danger from persons inside of the home. *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996); *see United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) ("Although *Buie* concerned an arrest made in the home, the principles enunciated by the Supreme Court are fully applicable where, as here, the arrest takes place just outside the residence"); *United States v. Calhoun*, 49 F.3d 231, 234 n.3 (6th Cir. 1995) ("Because Calhoun was arrested outside her apartment, a warrantless search of the apartment could be justified only if the officers had a specific, reasonable basis for believing . . . that they were in danger from persons inside, as analyzed in *Buie*").

While performing a protective sweep, "an officer may seize contraband in plain view if its incriminating character is immediately clear." *United States v. Lanier*, 285 F. App'x 239, 241 (6th Cir. 2008). The burden of proving the constitutionality of the warrantless search rests with the government. *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009).

Crail argues the facts in *Archibald* mirror the facts in this case, but this Court disagrees. In *Archibald*, four officers went to the defendant's apartment to serve him with two arrest warrants for probation violations. *Id.* at 291. Prior to serving the warrants, the officers reviewed the defendant's criminal history and learned he had been charged previously with attempted homicide, resisting arrest, evading arrest, assault, drug offenses, and a weapons offense, making

5

him a "higher risk." *Id.* Unlike the officers who arrested Crail, the officers in *Archibald* had no information, prior to arriving at the apartment, about whether the defendant was living with other people.

The officers knocked on the defendant's door around 7:00 p.m., knocked again, and heard movement inside of the defendant's residence, but no one came to the door immediately. *Id.* at 291–93. It took the defendant about ten minutes to open the door, and when he did, an officer, "stepped slightly into the apartment, grabbed the [d]efendant, and took a quick glimpse inside." *Id.* 292–93. The defendant was pulled "out of the doorway and off the porch." *Id.* at 293. An officer then conducted a protective sweep of the apartment and found narcotic contraband. *Id.* Regarding the possibility that another person was in the apartment, the officer testified that: "Based on the totality of what we encountered at the door, plus his criminal history and things of that nature. *We always assume that there could be,* whenever we're serving a warrant, for officer safety." *Id.* at 292 (emphasis added to testimony).

The *Archibald* court found that the officer's assumption was not enough, because the record contained "no evidence, circumstantial or otherwise, of the presence of a dangerous third party in Archibald's residence." *Id.* at 299. A lack of knowledge as to whether others were in the home necessarily fails the *Buie* standard, which requires articulable facts, not ignorance. *Id* at 300. Without articulable facts from which a rational inference could be made, the prospective sweep was not justified. *Id.* at 301–02.

The necessary articulable facts did exist in *United States v. Biggs*, 70 F.3d 913 (6th Cir. 1995). Three officers went to the motel room of the defendant who was wanted on a fugitive warrant. *Id.* at 915. The officers received information that someone was expected to come to the defendant's motel room prior to arriving. *Id.* About two hours after the officers had begun

surveillance, the defendant emerged from his room, barefoot and shirtless, and walked out to his truck in the parking lot. *Id.* He left the front door to his motel room ajar. *Id.* The officers arrested the defendant at the truck, and then undertook a protective sweep of the room, where a gun was found in plain view in an open suitcase. *Id.*

The defendant argued that the search of his room after his arrest violated his Fourth Amendment rights, and that the gun should be suppressed. *Id.* at 914. The court disagreed, finding there were "several articulable factors that would lead a reasonably prudent officer to believe that the officers might be in danger from someone in the motel room." *Id.* at 916. First, the officers had received information that another person would be meeting the defendant at the motel room, and although they never saw anyone enter the room, they did not know if someone was already in the room. *Id.* Second, the officers safety was threatened because the motel room door had been left open, and anyone present in the room would have had a clear view of the officers. *Id.* Finally, the officers were familiar with the defendant and knew he had been arrested on two previous occasions in the presence of someone with a firearm. *Id.* Taken together, these facts indicated that the officers reasonably believed that they were authorized to sweep the motel room. *Id.*

Other courts in this Circuit have reached similar conclusions where the officers conducting a protective sweep outside of a residence were able to articulate facts that would lead a reasonable officer to conclude that the home from which a defendant emerged could harbor an individual posing a danger. For example, in *United States v. Atchley*, the court held that officers were justified in conducting a protective sweep of a motel room, when the defendant was arrested 20-30 feet outside of the room, where the officers had received a tip that more than one individual was manufacturing methamphetamines in the room, two of the defendant's

companions had escaped during a confrontation with the police in the parking lot, and from outside of the room, the police had observed a handgun on the bed. 474 F.3d 840, 844, 849–50 (6th Cir. 2007). Similarly in *Henry*, information that the defendant would have weapons and that his "boys" or "counterparts" might be with him, according to an informant, coupled with the defendant's arrest taking place just outside an open door, were sufficient to lead a reasonably prudent policeman to fear that he was vulnerable to attack. 48 F.3d at 1248; *see also United States v. Stover*, 474 F.3d 904, 910 (6th Cir. 2007) (officers were justified in conducting a protective sweep, even of a crawl space in a laundry room, after the defendant's arrest, where they had observed a parked car in the defendant's driveway that was registered to a man who did not live at the defendant's address, identified by local police as a criminal).

The government has met its burden of demonstrating articulable facts justifying the officers' protective sweep under the second prong of *Buie*. Prior to arriving to Crail's home, the officers were advised that others, including Crail's wife, could be present in the residence. Someone other than Crail and his wife was receiving mail at the Dublin residence. When the task force arrived, they observed an unidentifiable vehicle parked in Crail's driveway. Importantly, when the officers were talking with Crail, prior to his arrest from the doorway, the front door to the home remained ajar, and the officers could see in. The officers testified, on multiple occasions at the suppression hearing, that they could hear and see movement through the doorway.[1] Moreover, once Crail was actually detained, some officers were forced to wait

---

[1] At the suppression hearing, Crail's counsel questioned Simmons about whether the noise and movement he heard and observed through the space between the door and doorsill was from Crail's dog. Simmons could not remember whether he heard dogs barking. Simmons was also unable to remember how many dogs were present inside of Crail's home. Because Simmons could not have been sure whether the noise and movement was from dogs or humans, and he had knowledge that it was very possible others could be present in Crail's home, the most cautious thing for him to do was assume the noise and movement was from humans, or both dogs and humans. This Court finds Crail's counsel's attempt to discredit Simmons's testimony unpersuasive.

outside the home for a van to arrive, which posed an additional safety threat, as someone from inside the home could have starting shooting at the officers and Crail from inside the home.

Once the officers entered the home and detained Shipe and Karaba, the officers conducted a protective sweep of the remainder of the home. The officers were justified in searching the remainder of the home because Simmons testified that Shipe and Karaba were non-committal about whether there was anyone else in the home. After having already found two individuals in the home, obtaining no information about whether any other individuals remained in hiding, and observing drug residue and firearm-related items on the first floor of the home, the officers were warranted in conducting a protective sweep of the basement as well. At the suppression hearing, Crail's attorney conceded that after the officers encountered Shipe and Karaba, they were justified in conducting the protective sweep. Moreover, even if he had not conceded this point, the evidence obtained on the first floor of the residence—drug residue and firearm-related items—would have been sufficient to show probable cause and obtain a search warrant. *United States v. Beasley*, 199 F. App'x 418, 425 (6th Cir. 2006) (explaining that because the officer was "legally present in a place from which he could plainly view items that immediately appeared to him to be evidence of criminal wrongdoing, a plain view analysis was appropriately applied by the district court to justify the existence of probable cause necessary to issue a warrant to search" the hotel room); *United States v. Johnson*, 9 F.3d 506, 511 (6th Cir. 1993) (explaining that evidence legitimately observed in plain view during a protective sweep supported the search warrant).

## IV. CONCLUSION

For the reasons set forth herein, Crail's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

                                            **s/ Algenon L. Marbley**
                                            **Algenon L. Marbley**
                                            **United States District Judge**

**Dated: August 16, 2012**